1
2
3
4
5
6
7
8                      **UNITED STATES DISTRICT COURT**

9                      **SOUTHERN DISTRICT OF CALIFORNIA**

10    THREE RIVERS PROVIDER                    CASE NO. 14cv1092 JM(KSC)
      NETWORK, INC.,
11                                             ORDER DENYING MOTION TO
                                Plaintiff,     STAY; GRANTING LEAVE TO FILE
12         vs.                                 THIRD-PARTY COMPLAINT

13    JETT INTEGRATION and JEFF OTT,

14                                Defendants.

15    ─────────────────────────────

16    JETT INTEGRATION,

                                Counterclaimant,
17         vs.

18    THREE RIVERS PROVIDER
      NETWORK, INC.
19
                                Counterdefendant.
20

21

22         Counterclaimant and Defendants Jett Integration, Inc. ("Jett") and Jeff Ott

23    ("Ott") move to stay this action or, alternatively, to file a Third-Party Complaint to

24    Name Jeff Sodeman as a third-party defendant.[1]  Plaintiff and Counterdefendant Three

25    ─────────────────────────────

26         [1] The court notes that defendants erroneously refer to the motion as one for leave
      to file amended counterclaims.   The court notes that the Federal Rules of Civil
27    Procedure identify that defendants' motion is properly called a motion for leave to file
      third-party complaint.  Fed.R.Civ.P. 14(a)(1).  The court also notes that the parties
28    erroneously refer to themselves as cross-complainant and cross-defendant.  Under the
      federal rules, these parties are more properly designated as counterclaimant and
      counterdefendant.

Rivers Provider Network, Inc. ("TRPN") opposes both motions.  Pursuant to Local Rule 7.1(d)(1), the court finds the matters presented appropriate for decision without oral argument.  For the reasons set forth below, the court denies the motion to stay and grants the motion to file an amended counterclaim.

## BACKGROUND

On October 11, 2013, in the United States District Court for the District of Nevada, TRPN commenced this action seeking legal, equitable, and injunctive relief. On October 30, 2014, the action was transferred to the present judicial district pursuant to a forum selection provision in an agreement between the parties.

The complaint alleges eight claims for relief: declaratory relief, breach of contract, civil conspiracy to breach fiduciary duty, fraud, civil conspiracy/conversion of corporate funds, civil conspiracy/conversion of corporate property, civil RICO, and unjust enrichment.  (Ct. Dkt. 1).  The following allegations overlap with those in two related cases, one a federal criminal prosecution pending in this judicial district, United States of America v. Blaine Pollock, Case No. 12cr4599 MMA, (the "Federal Criminal Action"), and the other pending in the Superior Court of the State of California for the County of San Diego, Three Rivers Provider Network, Inc. v. Ronson Shamoun, Todd Breeden, and Law Offices of Ronson Shamoun, Case No. 37-2012-00090505-CU-BT-CTL (the "State Action"), as more fully discussed below.

The Complaint

TRPN is a Nevada corporation with its principal place of business in Henderson, Nevada.  TRPN is in the technology hosting services business.  Among other things, the software used by TRPN "contains highly sensitive data, including medical records of patients, billing records of providers, rates of repayment with medical providers, rates of reimbursement to clients, and a wide range of sensitive, private, privileged and trade secret data."  (Compl. ¶5).  Prior to 2007 TRPN used a third-party hosting company "to protect and safeguard TRPN's access to the software and technology services needed to effectuate the everyday aspects of the business."  Id.

In 2007 a former Chief Operating Officer ("COO") of TRPN, Todd Breeden, and Jeff Ott, then an employee of the company retained to host TRPN's technology services, allegedly represented to TRPN that the hosting company could no longer provide the services required by TRPN and was unilaterally terminating the servicing arrangement.  (Compl. ¶6).  TRPN alleges that  the representations were a "lie," and that Breeden himself terminated the contract and then conspired with Ott to "use control over the technology accessed and used by TRPN to loot the company of millions of dollars, essential trade secrets, and software systems."  Id.

Breeden, Ott, and Jett allegedly "promised to safeguard the trade secrets of the company by hosting its technology and servers."  TRPN alleges that it was over-billed by about $1.2 million "in order to fund a competitor business Breeden and Ott would co-own."  (Compl. ¶7).  In order to make the conspiracy work, TRPN alleges that "Ott needed to misuse his access to the technology to enable Breeden to steal the trade secrets of the business, including client rate data, client contractual terms, customer contractual terms, software access terms, and other trade secrets of the business."  (Compl. ¶8).

In order to obtain TRPN's trade secrets, in 2010, Ott met with Jeff Sodeman, discussed the objectives of the alleged conspiracy, and "used Sodeman to steal the code of the technology."  ¶9).  In 2011, Breeden caused TRPN to hire Sodeman as someone who could "upgrade" TRPN's technology but, in reality, Sodeman would misappropriate the technology.  In the summer of 2011, Sodeman left his employment position with TRPN and began working for the competitor business created by Breeden and Ott, America's Choice Provider Network ("ACPN").  Sodeman received a salary of $200,000 per year and 8% ownership of ACPN - a company that both Breeden and Ott allegedly believed could be worth about $100,000,000 by 2012.

TRPN alleges that Ott controlled more than 40% of the shares of ACPN.  Ott allegedly used the stolen technology from TRPN to capitalize ACPN and enable "Breeden to steal trade secrets . . . and practically all of the company's intellectual

14cv1092

1   property and licenses, to put ACPN on 'equal' footing with TRPN." (Compl. 10).

2       Not only did Ott allegedly conspire with Breeden to misappropriate TRPN's
3   trade secrets and technology, but he also allegedly conspired with Breeden's attorney,
4   Ronson Shamoun, "to falsify allegations against TRPN, with the intention of causing
5   TRPN to fail, and promising third party potential investors in ACPN that they could
6   cause TRPN's failure and then 'step in the shoes' of TRPN." (Compl. ¶12).  At about
7   this same time, Jett, through Ott, allegedly "lied to TRPN, telling TRPN officers he had
8   nothing to do with ACPN or any competitor business." (Compl. §13).  TRPN alleges
9   that Breeden paid Shamoun more than $373,000 in legal fees from TRPN funds which
10  "in fact were intended to and did, capitalize a competitor business of TRPN.  Shamoun
11  owns 10% of ACPN through his wife, and further provides office space for ACPN in
12  a building owned by him, purchased by moneys paid to him from TRPN." (Compl.
13  ¶15).

14  Jett's Counterclaims

15      On May 14, 2014, Jett filed a countercomplaint alleging three claims for relief:
16  breach of the Managed Services Contract, breach of the Hosting Services Contract, and
17  breach of the covenant of fair dealing and good faith.  (Ct. Dkt. 35).  Jett alleges that
18  it entered into two different contracts with TRPN, one called a Managed Services
19  Contract and the other called a Hosting Services Contract.  Jett alleges that it complied
20  with its contractual obligations and that TRPN owes $14,524 under the Managed
21  Services Contract and $65,425 under the Hosting Services Contract.

22      On June 4, 2014, TRPN filed an answer to the counterclaims.  TRPN generally
23  denies the material charging allegations.

24  The Federal Action

25      On June 27, 2013, the United States filed a criminal complaint against Blaine
26  Pollock, principal and founder of TRPN.  The Superseding Indictment, filed on June
27  27, 2013, alleges thirteen counts for filing false tax returns in violation of 26 U.S.C.
28  §7206(1), aiding and abetting in violation of 18 U.S.C. §2, aiding and assisting in the

filing of false tax returns in violation of 26 U.S.C. §7206(2), and conspiracy in violation of 18 U.S.C. §371.

In broad brush, the Superseding Indictment alleges that Pollock under reported his personal income for tax years 2006-2009 (Counts 1 to 4), aided and assisted in preparing materially false and misleading tax returns for TRPN for tax years 2006-2009 (Counts 5 to 8), aided and assisted in preparing materially false and misleading tax returns for Managed Care Strategies, Inc. for tax years 2006-2009 (Counts 9 to 12), and conspired to impede, obstruct, and defeat the functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of income taxes.

The State Action

On June 12, 2012, TRPN commenced an action against Breeden, Ronson Shamoun, and the Law Offices of Ronson Shamoun.  The complaint alleges eight claims for relief against Shamoun and the Law Offices of Ronson Shamoun: declaratory relief, breach of contract, breach of fiduciary duty, civil conspiracy, fraud, civil conspiracy/conversion, civil conspiracy/conversion, and professional malpractice. The complaint also alleges four claims against Breeden: declaratory relief, conversion, intentional misrepresentation, and conspiracy to commit conversion. (Exh. A).

In broad brush, TRPN alleges that Breeden falsely represented that he was college educated with significant COO skills.  In fact, TRPN alleges that Breeden possessed only a high school education and little experience in accounting.  TRPN did not discover the alleged true facts until Breeden voluntarily departed in 2011; and TRPN commenced a counseled investigation that discovered Breeden's alleged wrongdoing.  (State Complaint, "State Compl." ¶5).  During his employment with TRPN, the complaint alleges:

> After successfully obtaining employment, Breeden, between 2005 and 2011, routinely diverted money from TRPN to himself personally through payments to various entities, unilateral acceptance of certain credits, provisioning of other personal benefits, each of which he failed to report as personal income, which he further failed to report to TRPN.  Breeden accomplished the scheme by diverting the corporate records of these other entities to his personal residence and away from the business, while using separate accountants other than  the  corporate  accountants  for  these

payments, deceiving corporate auditors, attorneys and accountants about his course of conduct. Breeden then falsified tax returns to avoid paying tax on the moneys received, perjured the returns, failed to pay the tax due, and precipitated an IRS inquiry.

(State Compl. ¶6).

Shamoun and the Shamoun Law Offices purported to jointly represent Breeden and TRPN in any investigation. TRPN alleges that Shamoun and Breeden, in fact, sold corporate assets and "sought to create a cash pile from company resources and sale of corporate assets that Breeden and Shamoun intended to use to enrich themselves from liquidated assets securitizing certain business needs, while promising the company this was the proper strategy to deal with pending matters, recommending a distressed sale of substantial assets intended to securitize and collateralize corporate obligations and business needs." (State Compl. ¶20). To sell the assets, "Shamoun asked Breeden to obtain and access corporate and privileged information about Pollock's intentions and relations. Recommending Breeden get Pollock to use Shamoun's personal broker for such sales and transactions" in order to reap a kickback from the sale of assets. Id. After attempting to broker sales of certain assets, Shamoun then allegedly issued false invoices for work never performed by Shamoun, "some of which was for Breeden's personal legal cost and embezzled on Breeden's behalf and some of which was for Shamoun's own self-enrichment." (State Compl. ¶31). During this period of time, Breeden was under investigation by the IRS.

In October 2011, TRPN and Pollock retained new counsel to represent them in all IRS matters. New counsel discovered massive deductions never taken by Breeden. In November 2011 Breeden demanded that Shamoun be paid $73,000 or he "would be negative about TRPN to the public." One week later, Breeden resigned.

On October 18, 2013, Breeden moved to stay the State Action on the ground that there was a threat of a criminal action against him and that he was entitled to stay the State Action pending the expiration of the criminal proceedings in the Federal Criminal Action. In that action, the lead United States Attorney, David Leshner, declared that civil discovery in the State Action posed a risk of adversely affecting the federal

criminal prosecution. On March 6, 2014, Judge Katherine Bacal stayed the action for six months noting, based upon the declaration of David Leshner, that civil discovery would pose a risk of adversely affecting the Federal Criminal Action. (Ott Exh. D).

## DISCUSSION

**The Motion to Stay**

Defendants move the court to abstain from exercising jurisdiction pursuant to the doctrine identified in Colorado River Water Conservation v. United States, 424 U.S. 800 (1976) or, alternatively, to stay the action on grounds that Breeden is facing possible criminal proceedings and may assert his Fifth Amendment rights. Each argument is discussed in turn.

### The Colorado River Doctrine

Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction conferred upon them. Colorado River, 424 U.S. at 817. Therefore, a stay of an action is appropriate only under exceptional circumstances. Id. at 813. Under the Colorado River doctrine, a federal court may abstain from exercising its jurisdiction in favor of parallel state proceedings where doing so would serve the interests of "[w]ise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation." Id. at 818; see Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 15 (1983). "Exact parallelism" between the state and federal actions is not required; it is enough if the two actions are "substantially similar." Nakash v. Marciano, 882 F.2d 1411, 1416 (9th Cir. 1989).

Courts consider several non-exhaustive factors in determining whether to stay or dismiss under Colorado River: (1) whether the state court first assumed jurisdiction over property; (2) inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings are inadequate to protect the federal litigant's rights; (7) whether exercising jurisdiction would promote forum shopping; and (8)

1  whether the state court proceedings will resolve all issues before the federal court. See
2  Moes H. Cone, 460 U.S. at 15-16; Holder v. Holder, 305 F.3d 854, 870 (9th Cir. 2002);
3  R.R. St. & Co. Inc. v. Transp. Ins. Co., 656 F.3d 966, 978–79 (9th Cir. 2011). These
4  factors should be weighed in a "pragmatic, flexible manner with a view to the realities
5  of the case at hand" and "with the balance heavily weighted in favor of the exercise of
6  jurisdiction." Moses, 460 U.S. at 16, 21. Factors that are irrelevant to the particular
7  inquiry are disregarded. See Nakash, 882 F.2d at 1415 n.6.

8       Upon consideration of the high legal standard and the relevant factors, the court
9  finds that the circumstances surrounding this case are not so exceptional as to warrant
10 abstaining under Colorado River.  The balance already is "heavily weighted in favor
11 of the exercise of jurisdiction," Moses, 460 U.S. at 16, and a majority of the relevant
12 factors support retaining jurisdiction over the action.  The court notes that the parties
13 in the two actions are different.  The claims against Breeden and Shamoun in the State
14 Action will not resolve the claims against Jett and Ott in this action.  The State Action
15 will not afford TRPN relief for the harm allegedly caused by Jett and Ott.  While there
16 is some overlap in the factual circumstances between the two cases, the court has
17 substantial doubt that the State Action will be an adequate vehicle to grant TRPN
18 complete and prompt relief.  Further, litigating in this forum is as convenient for
19 witnesses as it is in the Superior Court, located across the street from the Federal Court.
20 While there is overlap between the two actions, and in this sense may constitute
21 "piecemeal litigation," avoidance of piecemeal litigation is not a sufficient reason by
22 itself for a federal court to refuse to exercise its jurisdiction.  In Colorado River, the
23 Supreme Court found that the McCarran Amendment at issue expressed the clear
24 federal policy to avoid the piecemeal adjudication of water rights in a river system.  Id.
25 at 819.  Here, in contrast to Colorado River, there is no identified federal policy
26 expressly seeking to avoid piecemeal litigation.  TRPN's claims primarily arise under
27 state law (the only federal claim is for the alleged violation of civil RICO).  This court
28 is obligated to provide a complete and prompt resolution of all claims, both state and

1   federal.  See Intel Corp. v. Advanced MicroDevices, Inc., 12 F.3d 908, 915 (9th Cir.

2   1993).

3        Under these circumstances, the court finds that, on balance, factors of "wise

4   judicial administration" do not favor invoking the Colorado River doctrine.

5   Potential Future Criminal Proceedings

6        Defendants argue that criminal charges may be brought against Breeden.

7   Moreover, as Breeden will likely invoke the Fifth Amendment, Defendants conclude

8   that a stay of this action is warranted pending resolution of the Federal Action.

9   Defendants present no evidence that Breeden is either a target in any criminal

10  proceeding or that Breeden would not comply with the discovery obligations of the

11  Federal Rules of Civil Procedure.

12       In the ordinary course, the Constitution does not require a stay of civil

13  proceedings pending the outcome of criminal proceedings.  Keating v. Office of Thrift

14  Supervision, 45 F.3d 322, 324 (9th Cir. 1995).  "In the absence of substantial prejudice

15  to the rights of the parties involved, [simultaneous] parallel [civil and criminal]

16  proceedings are unobjectionable under our jurisprudence."  "Nevertheless, a court may

17  decide in its discretion to stay civil proceedings ... 'when the interests of justice seem

18  [ ] to require such action.'"  Id.  (Citations omitted).

19       The decision whether to stay civil proceedings in the face of a parallel
    criminal proceeding should be made "in light of the particular
20   circumstances and competing interests involved in the case." This means
    the decisionmaker should consider "the extent to which the defendant's
21   fifth amendment rights are implicated."  Id.  In addition, the
    decisionmaker should generally consider the following factors:  (1) the
22   interest of the plaintiffs in proceeding expeditiously with this litigation or
    any particular aspect of it, and the potential prejudice to plaintiffs of a
23   delay; (2) the burden which any particular aspect of the proceedings may
    impose on defendants; (3) the convenience of the court in the management
24   of its cases, and the efficient use of judicial resources; (4) the interests of
    persons not parties to the civil litigation; and (5) the interest of the public
25   in the pending civil and criminal litigation.

26  Id. at 324-25.

27       Upon consideration of relevant factors, the court finds that it is not in the

28  interests of justice to stay the action.  TRPN has a strong interest in pursuing its claims

for relief to address alleged wrongs; Defendants cannot demonstrate any prejudice as Breeden is not a party nor is there any indication that Breeden would invoke his Fifth Amendment rights to frustrate discovery; this court's use of judicial resources, whether the action is stayed or not, is neutral at best; and both the parties and the public have an interest in resolving civil cases expeditiously.

In sum, the court denies the motion to stay.

**The Motion for Leave to File Third-Party Complaint**

Pursuant to Fed.R.Civ.P. 14(a)(1), Defendants move for leave to file a third-party complaint against Sodeman. Rule 14(a)(1) provides, in pertinent part, that with the court's leave, "a defending party may, as third-party plaintiff, serve summons and complaint on a non party who is or may be liable to it for all or part of the claim against it." Accordingly, a third-party claim may be asserted under Rule 14(a)(1) only when the third-party's liability is in some way dependent on the outcome of the main claim, or when the third-party is secondarily liable to the defending party. See Stewart v. American Int'l Oil and Gas Co., 845 F.2d 196, 199–200 (9th Cir.1988). In other words, a defendant bringing a third-party claim must be attempting to transfer to the third-party a liability asserted by the original plaintiff against that defendant. Id. at 200; C. Wright, A. Miller, M. Kane, R. Marcus, 6 Federal Practice and Procedure (3d ed.2011) § 1446.

Whether to grant a Rule 14(a)(1) impleader motion rests in the sound discretion of the trial court. United States v. One Mercedes Benz, 708 F.2d 444, 452 (9th Cir. 1983). In a non-exhaustive list of considerations, the court will seek to balance the benefits afforded by liberal federal third-party practice against the possible prejudice to the plaintiff and the third-party defendant, complexity of the issues, likelihood of delay, and timeliness of the motion to implead. See Irwin v. Mascott, 94 F.Supp.2d 1052, 1056 (N.D. Cal. 2000).

Here, Defendants satisfy the requirements for impleader. With respect to the Rule's derivative liability requirement, the substantive basis for TRPN's complaint is

that Sodeman was the individual that TRPN alleges misappropriated its technology on behalf of Defendants and himself and received financial benefit for the alleged misappropriation. Defendants deny having converted TRPN's property or instructing Sodeman to do so. The allegations set forth in the proposed third-party complaint could possibly impose some liability arising in tort or contract. Accordingly, without addressing the merits or ultimate viability of the third-party complaint, this threshold requirement is satisfied.

In regard to timeliness and prejudice, the court grants the motion. This case is still early in the discovery phase, TRPN will not be prejudiced as it alleges that Sodeman was the party who misappropriated the technology, Sodeman's joinder will not substantially complicate the action, and the impact on the timely resolution of this case will not be seriously compromised. The court concludes that the judicial economy benefits of allowing Defendants to implead Sodeman outweigh undue delay and prejudice to TRPN.

In sum, the court denies the motion to stay and grants the motion to implead Sodeman. Defendants are instructed to separately file the third-party complaint and to effectuate service within 14 days of entry of this order.

**IT IS SO ORDERED.**

DATED: February 27, 2015

_____
Hon. Jeffrey T. Miller
United States District Judge

cc:        All parties

- 11 -

14cv1092